# In the United States Court of Federal Claims

No. 10-476

(Filed: November 3, 2010)[1]

* * * * * * * * * * * * * * * * * * * *

PLANNERS COLLABORATIVE, INC.,

   *Plaintiff*,

v.

THE UNITED STATES,

   *Defendant*,

 and

DELTHA-CRITIQUE NSS JOINT
VENTURE,

   *Intervenor*.

* * * * * * * * * * * * * * * * * * * *

_____

OPINION

_____

BRUGGINK, Judge.

 This is a post-award bid protest. Plaintiff, a disappointed bidder, moved for judgment on the administrative record. Defendant and intervenor cross-moved for judgment. We heard oral argument on October 7, 2010. While we agree that some aspects of the procurement were mishandled, plaintiff was not prejudiced by those errors. Accordingly, we deny plaintiff's motion and grant the government's and intervenor's cross-motions.

---

[1] This opinion was initially filed under seal on October 13, 2010. The parties were afforded 14 days to propose redactions. We have reviewed their agreed-upon proposal and have redacted the material deserving of protection.

1

FACTUAL BACKGROUND[2]

Plaintiff, Planners Collaborative, Inc. ("Planners"), is the incumbent contractor at the National Aeronautics and Space Administration's ("NASA") Ames Research Center. The contract solicitation at issue here is for work in the Business Operations and Technical Services ("BOATS") section of the Center, where the contractor will provide general administrative support, support in human resources and information services, documentation services, exploration technology, facilities engineering, public affairs and media relations, intelligent systems, and strategic management and analysis.

NASA issued a final Request for Proposals ("RFP") on a single award BOATS contract for these administrative and support tasks. The contract has a performance period of two years with three one-year option periods. The Source Evaluation Board ("SEB") received five timely proposals, including Planners'. The proposals were to be evaluated based upon three factors: Past Performance, Mission Suitability, and Price.

The category of Past Performance allowed evaluators to review the bidders' past performance on similar contracts. A past contract's relevance was determined by comparing its size, content, and complexity to that of the BOATS contract.  Each offeror was invited to list not more than three relevant contracts in excess of $1,000,000 each that the offeror had received in the past five years.  Offerors were also invited to provide information regarding their major subcontractors' past performance on contracts meeting the same qualifications.  The SEB evaluated the relevancy of each offeror's past work and the strengths or weaknesses it demonstrated, assigning each offeror one of five levels of confidence: Very High, High, Moderate, Low, Very Low, or Neutral.

Planners submitted information about three of its past contracts as well as three contracts for each of its major subcontractors.  One of Planners' past contracts was below the $1,000,000 threshold required by the RFP as were several of its subcontractors' contracts.  After evaluation, Planners received a Moderate confidence rating for Past Performance.  The only contract referenced in the SEB's discussion of Planners' past contract experience was the incumbent BOATS contract.  In its explanation of this rating, the SEB assigned a Strength for Planners' previous experience on the incumbent

---

[2] The facts are drawn from the Administrative Record ("AR").

contract. In contrast, the intervenor, Deltha-Critique NSS Joint Venture ("Deltha"), the eventual recipient of the contract, received a Very High confidence rating based upon its submission of three relevant contracts and the past performance of its management and workers.

The second of the major evaluative factors, Mission Suitability, contained three subfactors: Management Approach, Technical Understanding, and Safety and Health.[3] Mission Suitability was scored on a 1,000-point scale, with the subfactors weighing 500, 450, and 50 points respectively. As a part of the evaluative process, the SEB assigned strengths and weaknesses for various parts of the respective proposal. After evaluation, each subfactor was given an adjectival rating based on criteria set out in the RFP.[4] These adjectival ratings, in turn, correlated to a percentile range. The assigned percentage was then multiplied by the available points to determine the final point award for each subfactor.[5]

Planners received an adjectival rating of Poor in both Management Approach and Technical Understanding. Planners received a score of 150 out of 500 for its management approach and was assigned a Significant Weakness for perceived staffing inconsistencies, for changing the Government's labor categories without explanation, and for failing to anticipate staffing difficulties.

With respect to its Technical Understanding, Planners received a score of 127 out of 450. The SEB found that Planners' proposal relied too much on its incumbent performance, restated the Statement of Work ("SOW"), and lacked ingenuity. Planners received a Strength for its high quality photographs and a Weakness for failing to plan for potential problems in fulfilling the SOW. In contrast, Deltha scored exponentially higher than the rest of the

---

[3] Planners received a rating of "Good" for its Safety and Health Plan. That rating is not at issue in this protest.

[4] For example, the rating of "Very Good" was reserved for "[a] proposal having no deficiency and which demonstrates over-all competence. One or more significant strengths have been found, and strengths outbalance any weaknesses that exist." AR 80.

[5] For example, the adjectival rating of "Fair" correlates to 31-50%. Multiplying the assigned percentage score, for example 50%, by the available points (500) yields the offeror's score of 250.

3

offerors in the Mission Suitability aspect of the offer and was the only offeror to score an Excellent in the Technical Understanding subfactor, as shown in the table below.

|  | **Management Approach (500)** | **Technical Under- standing (450)** | **Safety&Health Plan (50)** | **Total (1000)** |
|---|---|---|---|---|
| **Deltha** | Excellent: 475 | Excellent: 428 | Good: 33 | 936 |
| **Powertek** | [   ] | [   ] | [   ] | [   ] |
| **C&L** | [   ] | [   ] | [   ] | [   ] |
| **Planners** | Poor: 150 | Poor: 127 | Good: 33 | 310 |
| **Maden** | [   ] | [   ] | [   ] | [   ] |

AR 1664.

For the final factor, Price, the SEB performed a price analysis on each offer, evaluating its risks and reasonableness. NASA compared the proposed prices with independent government cost estimates and analyzed pricing information from the offerors. NASA also evaluated the risk of default in the case of exceptionally low priced bids. A high risk of default could serve as the basis for not being selected. No numerical scores were assigned. The RFP made clear that while price was a factor, so long as a price was reasonable, it was less significant than Mission Suitability and Past Performance. Here, Planners' price of [   ] was the third lowest of the five, while Deltha's offer featured the highest price at [   ].[6]

The proposals as a whole were evaluated in accordance with the requirements of FAR subpart 15.3, "Source Selection," and the NASA FAR Supplement. The SEB members conducted individual evaluations of each proposal, assigning strengths and weaknesses based on the requirements of the FAR and the RFP. The SEB subsequently met and arrived at consensus findings on each of the offers. The SEB then prepared a draft of a slide presentation, which was subsequently revised twice, to present its findings and reasoning to the Source Selection Authority ("SSA"). The SSA adopted the SEB's findings *in toto*, a decision explained in her written statement.

---

[6] Maden, Powertek, and C&L were priced at [   ], [   ], and [   ], respectively.

On March 25, 2010, NASA made its selection decision. On April 6, 2010, NASA informed Planners via letter that a selection had been made and that Deltha was the winning offeror. The next day, Planners requested a post-award briefing. After this briefing, Planners filed a protest with the Government Accountability Office ("GAO") on April 26, 2010. NASA informed the other offerors of the protest, and the award of the contract was stayed. The GAO issued its decision on June 30, 2010, denying Planners' challenge. Planners subsequently filed its complaint here on July 23, 2010.

## DISCUSSION

We have jurisdiction under the Tucker Act to hear protests "in connection with a procurement or proposed procurement." 28 U.S.C. § 1491(b)(1) (2006). In a bid protest, the court "may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs." *Id.* § 1491(b)(2). The Tucker Act also mandates that our standard of review is the same as that found in the Administrative Procedures Act. *Id.* § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."). Thus, we may hold unlawful and set aside any agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2006).

In addition, a protestor must demonstrate that it was "significantly prejudiced" by the alleged errors in the procurement process. *Bannum v. United States*, 404 F.3d 1346, 1353 (Fed. Cir. 2005). It is sufficient for the protestor to demonstrate that "but for the error, it would have had a substantial chance of securing the contract." *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1378 (Fed. Cir. 2009).

Planners makes five discrete arguments, alleging that NASA erred in its evaluation of Planners' Past Performance, its method of assigning point scores to the offers, its evaluation of Planners' Management Approach, its evaluation of Planners' Technical Understanding, and its failure to hold discussions with the offerors before awarding the contract.[7] We believe two

---

[7] A substantial portion of Planners' initial brief challenged the government's reliance at the GAO on what Planners characterized as *post hoc* rationale. Because the government has not advanced any such arguments here,

of Planners' contentions have merit, namely the evaluation of Past Performance and Management Approach. Despite this, we conclude that these errors did not prejudice Planners and they do not warrant a remand to the agency for reevaluation. We address each of the arguments in turn.

I. PAST PERFORMANCE

Planners' first contention regards the agency's evaluation of its past contracts performance. Planners' argument is fourfold: (1) that NASA failed to conduct a relevancy evaluation of Planners' past work; (2) that NASA failed to consider Planners' subcontractors' past work; (3) in the alternative, even if NASA did consider Planners' and its subcontractors' past contracts, that the SEB failed to document that evaluation; and (4) NASA wrongly gave higher scores to offerors with multiple relevant contracts. After reviewing the administrative record, we conclude that the first three of these contentions have merit. There is no evidence documenting the agency's relevance evaluation or supporting its determination that Planners had only one relevant past performance. This was error.

*A.  The RFP's Requirements and Planners' Submission*

Past Performance, along with Mission Suitability and Price, was one of the three primary factors on which offers were evaluated. Offerors were invited to submit a list of up to three relevant past contracts, each of which was to be in excess of $1,000,000, involve types of related effort, and either was awarded in the past five years or is currently ongoing. An offeror could submit a similar list for each of its major subcontractors' past work on contracts meeting these same qualifications. These previously awarded contracts were assessed for their similarity "in size, content, and complexity" to the BOATS contract. AR 81. Based on this evaluation, each offeror was given a rating based on the government's "level of confidence in the offeror's ability to perform the solicitation requirements." *Id.* The available ratings were Very High, High, Moderate, Low, Very Low, and Neutral, each of which was described in paragraph form. In determining the confidence rating, "the SEB's evaluation shall clearly document each Offeror's relevant past performance and the currency of the past performance to assess the Offeror's overall confidence rating to be assigned." *Id.*

---

we decline to discuss the point.

In its offer, Planners submitted three past contracts for itself and three for each of its three major subcontractors. One of Planners' past contracts was the current BOATS contract, on which it was the incumbent. The second was a contract with the [      ], for which Planners organized meetings and conducted reviews of transit stations to assess their compliance with disability laws. The third contract, which was below the RFP's $1,000,000 requirement, was for the design and coordination of an aerospace exhibit for NASA headquarters. Based on these past contracts, the SEB assigned Planners a Moderate confidence rating. A rating of Moderate, which three other offerors also received, is described as follows:

> The Offeror's relevant past performance is pertinent to this acquisition, and it demonstrates effective performance; fully responsive to contract requirements; reportable problems, but with little identifiable effect on overall performance. Based on the Offeror's performance record, there is a moderate level of confidence that the Offeror will successfully perform the required effort. (There may be strengths or weaknesses, or both.)

*Id.* Both the SEB's presentation and the SSA's Source Selection Statement assigned Planners a Strength for Past Performance, noting it had "successful and relevant technical past performance in all areas of the BOATS contract on one contract." AR 1657, 1674. Deltha, in contrast, received a rating of Very High confidence for its "exceptional performance" on "three relevant contracts that are comparable in size, scope and complexity to the BOATS requirement." AR 1652.

### B.   *Planners' Arguments re Past Performance*

Planners makes four contentions regarding the agency's evaluation of its Past Performance. The first three overlap somewhat and generally allege that NASA failed to conduct and document an evaluation of the relevance of Planners' and its subcontractors' past performances. FAR subpart 15.305(a)(2) requires the agency to consider the currency and relevance of past performance information. Additionally, the RFP requires the SEB to "clearly document" relevant past performance. AR 81. The agency may have undertaken this examination, but the record contains no evidence of a relevance determination with respect to Planners' or its subcontractors' past contracts other than as the incumbent. Nor is there evidence supporting the SEB's conclusion that only

7

Planners' current BOATS contract was sufficiently relevant to warrant consideration.

Apart from Planners' proposal, the record is devoid of any mention of Planners' performance on the [     ].[8] Neither the SEB's initial consensus findings, nor any of the drafts of its presentation, nor any other document in the record states, much less explains why, the [   ] is irrelevant. Whether it was sufficiently similar to the BOATS contract to be considered relevant we cannot say. However, it is impossible for us to determine if the SEB's decision to exclude it was rational or capricious when there is no evidence of such a decision ever being made nor any reasoning to support it. While the SEB was authorized to exclude irrelevant contracts from consideration, any such decision should have been documented and explained.

In response, the government argues that the evolution of the SEB's presentation materials implies that a relevance determination must have occurred at some point. For support, the government contrasts the initial draft of the SEB's presentation, which speaks of Planners' past performance in plural terms, with the final presentation, which credits only one relevant contract. It argues that the relevance analysis must have occurred at some intervening point. This implied evaluation is plainly insufficient to satisfy the SEB's obligation to consider and document its evaluation of Past Performance. Furthermore, we are not convinced that the SEB's initial presentation proves that the SEB had reviewed all of Planners' past contracts. While the draft does speak of "multiple past performance questionnaires," this section appears to be a mere template in which every offeror received identical comments, *see* AR 1458-62, not a substantive evaluation.

We disagree, however, with Planners' final argument that the SEB erred by awarding a higher rating to an offeror with multiple relevant past contracts than to an offeror with only a single relevant past contract. Although the RFP did not explicitly state that the number of relevant contracts would be a factor in the Past Performance evaluation, there are indications throughout the RFP that the number of past contracts was relevant. For example, the RFP's

---

[8] Of the three past contracts Planners submitted for itself, one was below the $1,000,000 threshold required by the RFP and was thus properly excluded from consideration. Additionally, Planners received a Strength for its performance as the incumbent BOATS contractor. Thus, the qualifying past contract that the agency ignored was Planners' [   ].

invitation for offerors to submit multiple past contracts, the availability of a Neutral confidence rating for offerors without any relevant past contracts, AR 82, and the reference to "depth" of experience, AR 88, all indicate that the number of relevant past contracts could factor into the evaluation. Furthermore, the RFP affirmatively encouraged offerors to submit as many relevant contracts as possible: "If the offeror or major subcontractor does not have enough references to meet these requirements, references shall be provided to the maximum extent possible." AR 66.

Ultimately, we conclude that NASA erred by failing to evaluate the relevance of Planners' and its subcontractors' Past Performance and by failing to explain the reasons for crediting Planners with only one relevant contract. This was error.

II.   SCORING SYSTEM

Planners claims that NASA used an "unexplained and undocumented point scoring" system and that the resulting evaluation was arbitrary and capricious. Pl.'s Mot. for J. 24-25. We cannot agree. The RFP clearly states that offers "will be evaluated in accordance with the requirements of FAR Subpart 15.3, 'Source Selection,' as supplemented by NFS Subpart 1815.3, 'Source Selection.'" AR 79. It further explains that "Mission Suitability subfactors will be assigned adjectival ratings and numerical scores," AR 82, and includes a table, identical to the one found in NASA FAR Supplement 1815.205(a)(3), describing the characteristics of each rating and its correlated percentile range.

Although the scoring system's use of percentile ranges—for example, a Fair proposal could receive 31-50% of the available points—leaves some room for discretion, we cannot say that this is arbitrary or capricious. The agency's scoring and rating system was explained and documented in the RFP. If this system was unduly ambiguous, that should have been clear to offerors before they bid.

III.   MISSION SUITABILITY

Planners makes two arguments regarding the evaluation and scoring of its proposal with respect to Mission Suitability. The Mission Suitability factor had three subfactors that determined the overall factor score: Management Approach, Technical Understanding, and Safety and Health Plan. Of the 1,000 possible points, Management Approach was worth 500 points, Technical

9

Understanding was worth 450 points, and Safety and Health Plan was worth 50. Planners disputes its scores only on the first two subfactors.

*A. Management Approach*

Planners received an adjectival rating of Poor for the Management Approach subfactor, scoring 150 of the 500 possible points. The RFP listed five main evaluative categories for Management Approach: Organizational Structure and Approach, Staffing, Total Compensation Plan, Phase-In Plan, and Organizational Conflicts of Interest Avoidance Plan. The proposal was to describe the bidder's managerial and business approaches and explain how these approaches would be used to accomplish the SOW.

The SEB assigned Planners a Significant Weakness for its staffing inconsistencies and failure to follow the Government's estimated labor categories. Also included in the Significant Weakness was a lack of anticipation for fulfilling staffing requirements, a conceded error on the part of the evaluators. The SEB also assigned Planners one Weakness for failing to present a rationale for identifying key positions and the authority given to those positions. Planners received no Strengths for this subfactor.

Planners argues that NASA's conceded error in criticizing a lack of anticipation for fulfilling staffing requirements contributed to the Significant Weakness and tainted the evaluation. Planners also alleges that the SEB's evaluation of its Management Approach was unfair because Deltha's management team received a Significant Strength for its experience and quality while Planners' team, which it alleges is equally qualified and experienced, did not. Instead, according to Planners, the SEB dismissed the excellence of its team due solely to its asserted over-reliance on its incumbency. NASA counters that there were many inconsistencies throughout the staffing aspects of the proposal that also contributed to the low score.

          1.      Planners' Reliance on Incumbency

It is unclear in the record whether Planners' reliance on incumbency contributed to the low Management Approach score, although it is true that the SEB scored Planners' Technical Understanding down for overly relying on its incumbency. Planners nevertheless contends that its management team is as strong as Deltha's team because its team currently performs the BOATS contract. In response to this argument, the government contends that, had the agency critiqued Planners' proposal for over-reliance on incumbency, the

10

criticism would have been valid. Our review of Planners' proposal suggests that if Planners was scored lower for over-reliance on its performance as incumbent, that determination was not irrational. The RFP specifically stated that the proposal must "not assume that the Source Evaluation Board is aware of company abilities, capabilities, plans, facilities, organization, or any other pertinent fact that is important to the accomplishment of the work." AR 57. Therefore, every fact necessary to respond to the RFP had to be contained within the four corners of the proposal.

Planners' proposal, while including details about some of its practices, was written in such a way that the reader was assumed to be aware of Planners' management team and how it performs the incumbent contract. For example, when explaining the management procedure for handling "Complex, Longer Tasks," Planners states what it aims to accomplish, describes one instance of past performance, and directs the reader to a "new feature" its management team utilizes. AR 249. In the process, Planners does not explain how it will perform the contract. Rather, it assumes the reader is familiar with the approaches Planners employs and thus needs to only be advised of additions to current, unstated managerial practices. This failure to fully describe its performance plan—instead explaining its practices as a combination of new and old—leaves a gap in understanding.

Similarly, in its discussion regarding "Monitoring and Controlling Costs," Planners briefly mentions its practice of [    ]. After this individual example of its past and present monitoring processes, Planners states that it will [    ] and will [    ]. AR 251. Again, the only way a procedure can be considered "new" is if Planners expects the evaluator to know procedures already in place and therefore what could be improved. The "old" processes are not described in full, and the new practices by themselves would be insufficient to successfully address the given managerial task.

In addressing its "Identification and Minimization of Risks," Planners provided a table listing BOATS Risk Areas and how Planners addresses these risks. For the first risk, the "financial health" of the contract, Planners responds that [    ].[9] AR 260. Later in the section, Planners also describes its "track record" as [    ]. AR 261. This statement cites four examples of Planners' performance of the incumbent contract. Planners relies on its

---

[9] Planners refers to its "proven" abilities and applies what it has done in the past throughout the table of potential risks and mitigation.

11

performance and expects the SEB to be aware of its ability to mitigate risk. A description of Planners' plan to mitigate future risk is missing, and Planners assumes that because it mitigated risks in the past, it will be able to do so in the future. The SEB is thus forced to make the same assumption.

These examples demonstrate that Planners referred to and relied upon its status as incumbent contractor throughout the Management Approach section of its proposal. If Planners is correct that this criticism caused a downscoring of the proposal, this was not irrational.

### 2. *Planners' Staff and Staffing Inconsistencies*

Planners also argues that because NASA determined Deltha's staff was "highly qualified and experienced . . . with clear lines of authority," AR 1599, NASA was required to give a comparable rating to Planners for its incumbent staff. Planners and Deltha both provided resumes for their key management and both provided organizational charts of varying clarity and complexity. It is not our role to reevaluate the qualifications of every member of each team or to perform our own head-to-head comparison to determine what the SEB should have decided. While Planners may have an adequate, perhaps even a superb, management team, the record reflects that Deltha also had an adequate and, in the opinion of the evaluators, superb management team.

There is no reason to question the description of Deltha's team as "highly qualified." AR 1599; *see, e.g.,* AR 868 (noting Deltha's Program Manager has [    ]); AR 876 (noting Deltha's Project Resource Manager has [    ]). Nor is it proper for us to determine which academic degrees are best suited for a project manager.[10] In the absence of some clear violation of the evaluation process, it is within the SEB's discretion to determine which proposals warrant the highest rankings based on the proposed management team.

Similarly, reasonable minds could differ as to which offeror's organizational charts are superior. Our task is only to determine if the SEB's evaluation was reasonable. Based on the administrative record before us, the assignment of a Strength to Deltha and the failure to assign the same Strength to Planners is not arbitrary.

---

[10] Deltha's Program Manager holds a [    ]. In contrast, the Program Manager for Planners possesses a [    ].

In addition, NASA cites ten other reasons for assigning a Significant Weakness to Planners' Management Approach. While we might disagree with the evaluators' analysis as to a few of these reasons, an examination of the other inconsistencies demonstrates that it was not arbitrary to assign Planners a Significant Weakness. For example, in the chart describing its incumbent staff and how that staff will populate the requirements of the new contract, there are multiple staffing inconsistencies between Planners' proposal and the RFP. These inconsistencies are never explained. The Government Labor Estimate ("GLE") suggests one Administrative Assistant III to fulfill SOW § 4.4. AR 141. Planners, however, proposes [    ]. AR 266. Similarly, the GLE calls for one photographer and one photographic archivist to fulfill the requirements of SOW § 4.13. AR 142. In contrast, Planners proposes [    ]. AR 266-67. Planners provides no explanation for diverging from the GLE.

It is evident in the record that these, and other,[11] staffing inconsistencies are a legitimate rationale for the assignment of a Significant Weakness to Planners' Management Approach. Our scope of review is to determine whether the decision was arbitrary and capricious. It is neither illogical nor arbitrary for the SEB to negatively appraise a proposal that deviates from the GLE without explanation.

        3.      The SEB's conceded error

In the SEB's presentation slides, it justified its assignment of a Significant Weakness by noting, among other criticisms, Planners' failure to prepare for "any difficulties anticipated in fulfilling staffing requirements and plans to overcome those difficulties." AR 1632. NASA has conceded that including this clause in the presentation slides was erroneous. The government, however, argues that this error did not affect the outcome because the SEB assigned the Significant Weakness prior to including this erroneous statement in the presentation slides. We do not agree.

---

[11] For example, SOW § 4.2 calls for an Administrative Assistant and one Administrative Assistant III. In response, Planners does not provide an Administrative Assistant, but instead offers [    ]. While the GLE called for one photographer at one level, AR 141-42, Planners offered three different [    ]. AR 266-67. Additionally, Planners provides different [    ].

13

We recognize that in the evaluators' initial consensus findings, the Significant Weakness was assigned solely for Planners' staffing inconsistencies and failure to address the alterations to the GLE. The slides presented to the SSA, however, include and rely on the error. Further, the error is included in the SSA's final determination: "The Significant Weakness was assigned because the Offeror's proposal contained staffing inconsistencies . . . and failed to anticipate or plan for possible difficulties in fulfilling staffing requirements." AR 1672. There is no additional Significant Weakness assigned, but the error is listed as part of the rationale behind assigning the Significant Weakness.

At oral argument, Planners asserted that, if the conceded error was removed, it is possible that the SSA would not have assigned Planners a Significant Weakness. Under this scenario, rather than receiving one Weakness and one Significant Weakness, Planners could have received simply two Weaknesses in Management Approach, leaving room for the possibility it could earn up to 200 more points in the Management Approach subpoint by graduating to a higher adjectival rating.

In the RFP, the qualifications for the adjectival ratings are clear: a rating of Poor (Planners' original rating) is assigned to a proposal with "one or more deficiencies or significant weaknesses that demonstrate a lack of overall competence or would require a major proposal revision to correct." AR 80. A rating of Fair is given to a "proposal having no deficiency and which has one or more weaknesses. Weaknesses outbalance any strengths." *Id*. According to the rating schedule in the RFP, then, an offer that has any Significant Weaknesses must be assigned a Poor adjectival rating, as Planners was. A rating of Good is awarded to a proposal that has "no deficiency and which shows a reasonably sound response . . . . As a whole, weaknesses not off-set by strengths do not significantly detract from the offeror's response." *Id*. To be assigned a Very Good, the proposal must "demonstrate[s] overall competence. One or more significant strengths have been found, and strengths outbalance any weaknesses that exist." *Id*.

Planners received no Strengths or Significant Strengths for the Management Approach subfactor. Under no circumstances, therefore, could it have been rated Very Good. Based upon the RFP's provisions, however, if the Significant Weakness is removed and Planners is left with two Weaknesses, there is potential it could receive a Good adjectival rating. In the best case scenario for Planners, then, its Significant Weakness that included the staffing inconsistencies addressed above would be downgraded to a

Weakness, leaving Planners with two Weaknesses in the Management Approach subfactor. If this occurred and the Weakness is considered to not significantly detract from the proposal, Planners could be assigned an adjectival rating of Good.

We find Planners' argument persuasive that it is at least possible that this error could have influenced the SSA's final assignment of the Significant Weakness. We consider below whether this error is prejudicial. *See infra* section V.

### *B. Technical Understanding*

The second subfactor determining the total score for Mission Suitability was Technical Understanding. The SEB evaluated how each proposal discussed "each functional area of the Statement of Work for appropriateness, reasonableness, and effectiveness." AR 85. Technical Understanding accounted for 450 of the 1,000 points available for Mission Suitability. The RFP stated: "Each proposal will be examined to evaluate the Offeror's overall understanding of the requirement and technical approach. Restating the Statement of Work (SOW) will not be interpreted as demonstrating understanding." AR 85. As already discussed, the RFP was also clear that it was inappropriate to rely on past performance or to assume the evaluator was familiar with the company's work or process.

Planners received 127 points and an adjectival rating of Poor in Technical Understanding. This scoring was precipitated by a Significant Weakness due to a lack of comprehension of the "diverse areas of the statement of work," not presenting an "innovative, efficient, and effective approach to accomplishing the requirements," and because Planners merely restated the SOW or referenced past or current performance in 35 sections of its proposal. AR 1674. Planners received one Strength for this subfactor due to its high quality photographic submission.

Although the SEB cited 35 different sections of Planners' proposal to bolster its Significant Weakness rating, Planners chose to only address two in its briefing. We address both of these, along with three other representative sections.

Planners first disputes the SEB's interpretation of its response to SOW § 4.2.2. The SOW lays out the main requirements: "Provide professional administrative support for Acquisition Division operations/ Support purchase

15

request (PR) screening/ Enter acquisition-related data into spreadsheets or menu-based management information systems/ Generate reports/ . . . Perform key operator functions for Acquisition copiers." AR 115. Planners' proposal first restates the bullet points of the SOW as prose: [    ]. AR 287. Planners goes on to articulate how it currently supports the Office of Administrative Support. The SEB's determination that Planners basically restates the SOW and discusses past or current performance is not arbitrary. At oral argument, Planners conceded that this section requires the reader to have knowledge of Planners' current work on the incumbent contract.

Planners also disputes the SEB's criticism of its response to SOW § 4.6.3, which addresses the Smart Skies program. While Planners did expand upon and change the order of the bullet points provided in the SOW, the SEB's critical assessment is not unreasonable. For instance, the SOW, in bullet point format, expects offerors to "[c]onduct professional development workshops/ Submit articles or papers for educational publications." AR 121. In response, under the *Teacher Training* heading in its proposal, Planners describes how it conducts and develops workshops, receives high evaluations, and publishes articles in professional publications. Similarly, the SOW expects offerors to "[d]isseminate educational publications, graphic and video materials." AR 120. In response, Planners' proposal states that [    ]. AR 302. While Planners expounded on the final bullet, "Identify potential partnerships, collaborations and business opportunities," it was reasonable for the SEB to conclude that Planners failed to provide any innovation or a forward looking proposal because it described its past successful partnerships and what they had accomplished in the past rather than what it proposed to do in the future. *See* AR 303.

Planners challenges only the SEB's treatment of the two sections just discussed. There were, however, 33 other sections the evaluators criticized. For example, in its response to SOW § 4.9.2, Planners does not address the first three bullet points of the SOW, but rather states that in 2008 the [    ], presumably referring to the incumbent contract. Planners also restates the SOW in prose: [    ]. AR 311-12. Though altering syntax and rewording a few provisions, Planners in essence restates the SOW bullet points: "Distribute announcements, registration, and confirmation notices/Collect evaluation data for course delivery, and evaluate programs for effectiveness/ conduct trend analysis on data collected to improve APPL-WEST." AR 124. It was reasonable for the SEB to conclude that Planners merely restated the SOW and relied on past and current work practices rather than discussing how it would perform the contract.

The SEB also decided that Planners' response to SOW 4.9.7 contributed to the Significant Weakness. Although it did expand upon the SOW in its proposal, Planners explained how it currently handles the incumbent contractual requirements and briefly restated the SOW. *See* AR 314. The SOW, however, contained a different requirement for the new BOATS contract than the incumbent contract: "Control property inventory, develop forms, support computer systems and data base, and produce statistical and narrative reports." AR 125. Planners' proposal states that [    ]. AR 315. Rather than properly addressing how it will carry out this new task, Planners responded by saying that the provision is new and then discussed its current performance under different contractual requirements. Similarly, Planners suggests SOW § 4.9.8 is obsolete because the referenced program ended in 2008. Planners discusses how it supported the program in the past and states that it will be [    ], AR 315, but that all it currently does is put together [    ]. AR 315. This ignores its obligation to offer a proposal for the completion of SOW § 4.9.8, even though that task currently is not part of the incumbent BOATS contract.

These examples are not isolated. We conclude that the SEB's determination that the proposal restated the SOW, lacked ingenuity, or relied on incumbent performance is rational. Though reasonable minds could differ in evaluating Planners' proposal, it is not our place to second guess the agency. We find that the SEB's determinations concerning Planners' technical understanding are not arbitrary, capricious, or an abuse of discretion.

IV.   FAILURE TO CONDUCT DISCUSSIONS

Planners' final argument is that it was error for the agency to award the contract without conducting discussions. We cannot agree. As an initial matter, the RFP explicitly warns that the contract would be awarded without discussions. AR 79. Planners nonetheless claims that because four of the five offerors scored so poorly, particularly on Technical Understanding, the procurement requirements must have been vague, thus obligating the agency to hold discussions. This argument is soundly rebutted by this court's precedent. An "agency has wide discretion with respect to the manner in which it conducts its procurements, including the decision whether to conduct discussions." *Data Monitor Sys., Inc. v. United States*, 74 Fed. Cl. 66, 73 (2006) (citing *Omega World Travel, Inc. v. United States*, 54 Fed. Cl. 570, 574 (2002)).

17

We are aware that in some instances, an agency's decision to award a contract without discussions may be unreasonable and erroneous. *See Day & Zimmerman Servs. v. United States*, 38 Fed. Cl. 591, 604 (1997) (finding it unreasonable for the government to refuse to conduct discussions where the agency adjusted offeror's cost estimate without explanation). This, however, is not one of those instances. The mere fact that four of five offerors scored poorly in one evaluative subfactor is not a sufficiently "peculiar circumstance," *id.*, to warrant our intrusion into the agency's discretionary decision not to conduct discussions.

V.    PREJUDICE

Having addressed each of Planners' main arguments, two of which we find meritorious in part, we turn to the question of prejudice. Although Planners is correct in some of its contentions, we conclude that the errors could not affect the outcome and that it would be fruitless for us to remand to the agency for reconsideration.

To prevail in a bid protest, the protestor "must first show that it was prejudiced by a significant error in the procurement process." *Labatt Food Servs., Inc. v. United States*, 577 F.3d 1375, 1378 (Fed. Cir. 2009) (citing *JWK Int'l Corp. v. United States*, 279 F.3d 985, 988 (Fed. Cir. 2002)). To establish prejudice, Planners must "show that there was a 'substantial chance' it would have received the contract award but for the [agency's] errors in the bid process." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1358 (Fed. Cir. 2005) (citing *Info. Tech. & App. Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003)); *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)). Here, Planners cannot make this showing. Even if we were to remand with instructions to reevaluate the two portions of the evaluation that we have identified as erroneous, Planners still would not have a substantial chance of receiving the award. Even in Planners' best case scenario on remand, it would be effectively tied for second place, and its overall score would still lag far behind Deltha's.

With respect to Past Performance, we can assume *arguendo* that on remand the SEB would determine that the [     ] was relevant. Planners then would have only two relevant contracts compared to Deltha's three. For the sake of argument, however, we would continue to assume that Planners could receive a Very High confidence rating for Past Performance, the same rating Deltha received. With respect to Management Approach, even after accounting for the errors we have identified, Planners would still have at least one

Weakness and no Strengths or Significant Strengths. Thus the best adjectival rating it could have received was a Good,[12] with the maximum potential score of 350.[13] Adding this number to Planners' score on the other two Mission Suitability subfactors would yield a total of 510 points for Mission Suitability.[14]

Consequently, if correction of the two errors lead to the best possible outcome for Planners, it could receive a Very High confidence rating on Past Performance and score a 510 out of 1,000 on Mission Suitability. Deltha, however, received a Very High rating for Past Performance and scored 936 points on Mission Suitability—nearly 80% higher than Planners' best case scenario. Although Planners' price was approximately 9% lower than Deltha's, this savings is insignificant in light of the dramatic difference in Mission Suitability score. *See* AR 92 ("Mission Suitability and Past Performance when combined are significantly more important than Price."). Accordingly, Planners cannot show that it had a substantial chance of receiving the award. The best Planners could hope for, in short, is a distant second place. Therefore, the errors we have identified were not prejudicial, and Planners cannot prevail.

## CONCLUSION

For the reasons set out above, we deny plaintiff's motion for judgment on the administrative record and grant defendant's and intervenor's cross-motions for judgment. The clerk is directed to dismiss the complaint and enter judgment accordingly. No costs.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Judge

---

[12] *See supra*, section III.A.3.

[13] A rating of Good correlates to a percentile range of 51-70%. Assuming Planners could receive the maximum percentage, multiplying 70% by the 500 points available yields 350 points.

[14] Planners' score of 127 points on the Technical Understanding subfactor and 33 points on the Safety and Health Plan subfactor would be unaffected.